NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ODIN S.,
*Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.S.,
*Appellees.*

No. 1 CA-JV 17-0142
FILED 10-31-2017

Appeal from the Superior Court in Maricopa County
No. JD15881
The Honorable William R. Wingard, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Michelle R. Nimmo
*Counsel for Appellee DCS*

---

## MEMORANDUM DECISION

Presiding Judge Michael J. Brown delivered the decision of the Court, in which Judge Jennifer B. Campbell and Judge Margaret H. Downie joined.

---

**B R O W N**, Judge:

¶1        Odin S. ("Father") appeals the superior court's order terminating his parental rights to his son, A.S., born in 2009 ("the child"). For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

¶2        In April 2014, the Department of Child Safety ("DCS") removed the child from the care of Father and the child's Mother based on a report of neglect and abandonment.[1]  At that time, DCS filed a dependency petition, alleging the child was dependent as to Father based on abuse or neglect in that Father had "not seen the child in approximately one year."  In the petition, DCS stated that the child was currently placed with his maternal grandmother ("Grandmother").

¶3        Several weeks prior to DCS's removal of the child, and while he was in Grandmother's care, the child disclosed to her that a man touched his genitals and bottom while in the backyard of Father's home.  Although DCS received the report from Grandmother on March 31, 2014, for reasons not clear from the record the incident was not reported to law enforcement until December 2014.  After several communications between the child and the Phoenix Police Department, including a forensic interview, the matter was closed in August 2015 because the interview process "did not reveal the details of a crime or the identity of someone who committed a crime against [the child]."

¶4        In July 2014, as a result of mediation, Father "submitted" the determination of dependency to the superior court, which found the child dependent.  Consistent with the case plan of family reunification, DCS offered Father various services, including child and family team meetings, therapeutic visitation, parenting classes, a family support partner, parent

---

[1]        Mother and Father were never married.  Mother's parental rights to the child were also terminated, but she is not a party to this appeal.

aide, facilitated visitation, drug testing and substance abuse treatment, transportation, psychological evaluation, psychosexual evaluation, and counseling. Because Father speaks only limited English, all services were conducted in Spanish. For the most part, Father successfully completed the services offered. In addition to offering services, DCS informed Father that he was expected to learn English to better communicate with the child, understand how his decisions have affected his ability to ensure the safety of the child, understand the emotional trauma the child has experienced due to the child's sexual abuse, and obtain legal status in the United States.

¶5            Visitation was one of the principal areas of concern in these proceedings. Early in the dependency, DCS facilitated therapeutic visitation at a neutral location. Dr. Perala, who conducted a bonding assessment in June 2015, recommended that the child be returned to Father "with visitation rights to the grandmother." DCS and the parties then progressed toward allowing supervised visits in Father's home, which occurred in early 2016. After several visits, the child experienced severe emotional trauma. In response, DCS asked the superior court to suspend all visitation. The court granted the request on a temporary basis in April 2016. After an evidentiary hearing in June 2016, during which the court heard testimony from the child's therapist and a DCS specialist, the court suspended all visitation absent further order of the court.[2]

¶6            In September 2016, the court approved DCS's request to change the case plan to severance and adoption. Shortly thereafter, DCS moved to terminate Father's parent-child relationship pursuant to Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(c) (15 months out-of-home placement).

¶7            Following a contested severance hearing held in March 2017, the court issued its order, finding that DCS proved the grounds for termination. The court explained that although Father had successfully completed many of the reunification services, he failed to apply the lessons

[2]            Father has not provided us with a transcript of the evidentiary hearing; thus, we presume that it supports the court's decision to suspend visitation. *See* Ariz. R.P. Juv. Ct. 104(E) (stating that appellant may designate transcripts that are not automatically included for appellate review); *Maricopa Cty. Juv. Action No. J-74449A*, 20 Ariz. App. 249, 251 (1973) (finding that a party challenging sufficiency of the evidence in a juvenile case has the burden to include a transcript for appellate review). Suspension of visitation became a key factor in the court's ultimate decision to terminate Father's parental rights.

he learned in order to demonstrate he could properly and safely parent the child. The court therefore determined that Father was unable to remedy the circumstances that caused the child to be in an out-of-home placement, and there was a substantial likelihood that Father would not be capable of exercising proper and effective parental care and control in the near future. The court also found that termination was in the best interests of the child. Father timely appealed the court's order.

## DISCUSSION

**¶8** To terminate parental rights, the superior court must find by clear and convincing evidence that at least one statutory ground articulated in A.R.S. § 8-533(B) has been proven and must find by a preponderance of the evidence that termination is in the best interests of the child. *See Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000); *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005). As the trier of fact, the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of the witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). Accordingly, we will accept the superior court's findings of fact "unless no reasonable evidence supports those findings." *Jennifer B. v. Ariz. Dep't of Econ. Sec.*, 189 Ariz. 553, 555 (App. 1997).

**¶9** To prevail on its motion to terminate Father's parental rights pursuant to A.R.S. § 8-533(B)(8)(c), DCS was required to show that the child has been in an out-of-home placement for 15 months or longer, Father "has been unable to remedy the circumstances that cause[d] the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental control in the near future." DCS is also required to make a "diligent effort to provide appropriate reunification services" before termination of parental rights. A.R.S. § 8-533(B). Moreover, DCS had to prove it "made a diligent effort to provide appropriate reunification services" to justify termination of a parent-child relationship. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 177, ¶ 12 (App. 2014) (internal quotation omitted).

**¶10** Father argues the superior court erred by focusing on the child's needs and that DCS failed to prove that Father (1) failed to remedy the circumstances that caused the child to be in an out-of-home placement, and (2) would not be capable of exercising proper and effective parental

care and control in the near future.[3]  Specifically, Father asserts that once the parties discovered that the child's visit to Father's home was traumatic for the child, DCS tried to find any behavioral change that Father did not complete or any reason for the case to proceed to severance.  He also argues that contrary to the court's ruling, he understood the child's needs, attended every child and family team meeting, and began learning English.

¶11         In its termination order, the superior court explained its findings in part as follows:

> Father has attempted to complete all services that have been offered to him. Despite his successful completion of many services, Father has been unable to remedy the circumstances that cause the child to remain in out-of-home care by failing to apply the lessons learned in those services to properly and safely parent the child.
>
> Father, on a basic level cannot communicate with the child. Father speaks Spanish and the child speaks English.  The child suffered severe trauma from sexual abuse.  Even now, Father continues to question the fact that the abuse happened, continues to blame the maternal grandmother for what he believes are fabrications, and has no recognition of how to deal with the child's current needs.  At trial, Father indicated that he understood the child is suffering from trauma, but in light of the history of this case, the Court finds the timing of this testimony questionable.  In February 2017, during his psychosexual evaluation, he still accused the maternal grandmother of making up these allegations to undermine the relationship between him and the child.
>
> *       *       *
>
> According to Camea Peca, the child's therapist, it will be a substantial amount of time, approximately [an] additional year, before the child will be ready to even begin visits with Father.

(Internal footnote omitted.)

---

[3]     Father does not challenge the superior court's findings that the child has been in an out-of-home placement for at least 15 months, DCS made diligent reunification efforts, and termination is in the child's best interests.

The record confirms Father substantially completed all of the reunification services; however, that is not the only relevant factor in determining whether DCS met its burden of proof. Instead, we must look at all the circumstances of the case. In doing so, we conclude that the record supports the superior court's findings.

¶12　　　　The child's therapist, Camea Peca, testified that the child's visit to Father's house triggered substantial emotional trauma stemming from the alleged sexual abuse incident that occurred at or near Father's home. As Peca explained, "there's something that happens for [the child] in the visits, and particularly in the visits that were taking place at the home, that re-triggers his body." The impact of the visits on the child included wetting the bed almost every night, sexualized behaviors, and night terrors. Peca also described the child as "literally frozen in the dissociative state," noting he was unable to string sentences together, his face was flat and he had "no affect." She added that when she first starting meeting with the child, he was very withdrawn, but after the visits at Father's home, the child "went to a totally different level of withdrawal and dissociation the second time around."

¶13　　　　These circumstances led directly to the superior court's decision, following an evidentiary hearing, to indefinitely suspend visitation. Given that ruling, although Father is not alleged to have abused the child, he needed to show he was taking steps to effectively parent the child, which plainly included helping him with emotional trauma.

¶14　　　　DCS specialist Yadira Palma testified that DCS expected Father to learn how his decisions affected his ability to ensure the safety and well-being of the child. The behavioral change, according to Palma, was essential because the child was experiencing "a lot of sexualized behavior due to his sexual trauma" and DCS wanted to ensure that Father would be able to address the child's needs if he were returned to Father's care. Palma explained further that the child had consistently reported that the alleged abuse occurred at Father's home, while Father was sleeping.

¶15　　　　Although Father completed his parent-aide services, participated in therapeutic visits, engaged in parenting classes through the Family Involvement Center, and took a two-hour trauma-based class, he failed to apply what he learned through those classes. According to Palma, Father often asked why the child behaved a certain way and accused

Grandmother of making up the sexualized behavior.[4] DCS was concerned that Father's attempts to blame Grandmother for making up facts about him, despite the child consistently maintaining that some type of abuse occurred (and being informed that Grandmother had the legal responsibility to report what the child experiences), showed Father's inability to focus on the child's needs instead of Grandmother's comments.

¶16 Further, despite the child's reaction to visiting Father's home, Palma testified that Father has continued to minimize the trauma, indicating that he was not taking the steps necessary to show he was capable of addressing the child's overall mental well-being. Palma explained further that by failing to understand this, it would stifle the improvements the child has made through therapy because Father would not be able to pick up on cues that the child was suffering. Additionally, it was important for Father to acknowledge the sexual abuse to protect the child from a future perpetrator.

¶17 Father also failed to enroll in any English classes, which were encouraged to permit better communication with the child, thus building a stronger bond. Dr. Peralta recommended that Father improve his English. Peca testified that despite requests that Father enroll in an "English as a second language" course, and his family support partner indicating she would help him starting in August 2015, Father did not enroll. And Palma

---

[4] At trial, Father testified that he believed the child suffered sexual abuse by somebody, but also acknowledged during his psychosexual evaluation that the allegations about sexual abuse were Grandmother's attempt to undermine the relationship between him and the child. Father asserts on appeal that Grandmother was a hindrance to reunification, which justified his skepticism of her reports regarding the child's behaviors. Addressing this issue, the superior court found in part,

> [n]othing that has been presented to the Court supports the argument that grandmother played any role in delaying this case or sabotaged the Father. Simply said, the Court understands that there is a strained relationship between the grandmother and Father, but attributes that to the fact that grandmother has cared for this child's best interests and provided safety for the child.

At best, there was conflicting evidence as to whether the Grandmother interfered with Father's efforts to reunify, and it is not our role to reweigh that evidence on appeal.

explained that greater proficiency in English would have helped Father to identify any issues the child may experience relating to sexual abuse.

¶18 As of the time of severance, the child had been in out-of-home care for almost three years. Palma opined that Father would not be able to parent in the near future because, in part, he "still does not understand the sexual abuse trauma that his child is experiencing." Peca opined it would take at least another year, assuming the child continued to progress at his current rate, to attempt to resume visits with Father. And, even if such visits resumed, it could trigger past traumas, resulting in similar adverse consequences. Given this record, reasonable evidence supports the superior court's termination order.

¶19 Father also argues the superior court improperly terminated his rights based solely on best interests of the child, citing *Desiree S. v. Department of Child Safety*, 235 Ariz. 532 (App. 2014). In *Desiree S.*, a mother challenged the termination of her parental rights to her 11-year-old child. *Id.* at 533-34, ¶¶ 1, 11. Despite evidence that the mother "successfully completed all of the reasonable services offered to implement family reunification," the superior court found that the mother was unable to remedy the circumstances that brought the child into care because the child did not believe his mother could protect him from abuse and he refused to participate in family counseling. *See id.* at 534, ¶ 11. On appeal, we reversed the termination order, holding that the child's subjective belief did not constitute clear and convincing evidence of his mother's parenting abilities and could not be the sole basis to determine whether mother would be unable to parent effectively in the near future. *Id.* at 534-35, ¶¶ 11, 14. We further noted that "[a]lthough [the child] participated in individual counseling, there was no evidence indicating why [the child] could not or should not participate in therapeutic family counseling with [his mother]." *Id.* at 534 n.5, ¶ 9.

¶20 Here, unlike *Desiree S.*, DCS presented evidence that Father would be unable to parent in the near future. The child's visits with Father caused serious emotional trauma for the child, and yet Father continues to downplay its significance. Father has not shown how he would properly care for the child if the child were to display the same emotional trauma upon reunification. Moreover, unlike the situation in *Desiree S.*, there is no evidence in this case that the child resisted visitation with Father, although the child has consistently indicated he wants to live with Grandmother. Further, the termination was not based on the mere passage of time while the court waited on the child to become stabilized before returning to a parent's care as was the case in *Jordan C. v. Arizona Department of Economic*

*Security*, 223 Ariz. 86 (App. 2009).  Here, Father was unable to demonstrate that he would be able to make the necessary changes to effectively parent the child within the near future.

## CONCLUSION

**¶21**        For the foregoing reasons, we affirm the superior court's termination of Father's parental rights.

